# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| MOHAMED HISHAM ELTAYEB, individually and on behalf of all others similarly situated, | § § § § | |
| *Plaintiff*, | § § | **CIVIL ACTION NO.  4:20-CV-00385** |
| v. | § § | **JUDGE MAZZANT** |
| DELI MANAGEMENT, INC. d/b/a "JASON'S DELI", | § § § | |
| *Defendant*. | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff's Combined Second Renewed Motion for Notice to Potential Plaintiffs (Dkt. #70). Having considered the motion and the relevant pleadings, the Court finds that Plaintiff's motion should be **DENIED** without prejudice.

## BACKGROUND

This case arises from the employment relationship between Defendant Deli Management, Inc., doing business as Jason's Deli, ("Jason's Deli") and its delivery drivers. Jason's Deli operates multiple restaurants and employs drivers to deliver food items to customers. Drivers make deliveries using their own vehicles.  Jason's Deli then reimburses delivery drivers pursuant to a method outlined in its policies. Through this policy, Jason's Deli instructs managers to maintain a spreadsheet to track drivers' mileage, number of deliveries, payouts per delivery, and total payouts (*see* Dkt. #46-11). The spreadsheet is designed to ensure all payouts meet the IRS guidelines.

Jason's Deli requires that its delivery drivers provide their own operable delivery vehicles

and vehicle insurance. Jason's Deli reimburses its delivery drivers for the cost of driving their own vehicles to perform deliveries according to the following table:

| National Unleaded Average | Delivery Driver Payout |
|---|---|
| <=$2.50 | $1.00 |
| $2.51 - $3.00 | $1.25 |
| $3.01 - $3.50 | $1.50 |
| $3.51 - $4.00 | $1.75 |
| $4.01 - $4.50 | $2.00 |

(Dkt. #70 at p. 9). Each delivery driver receives the outlined standard delivery payout for each delivery made within the store's designated delivery area. If a driver makes multiple deliveries during a single run, the driver will receive the standard delivery payout for each delivery. In other words, the delivery fees paid to drivers are not connected to the miles driven. If delivery drivers are assigned outside of their store's designated delivery area, they receive an additional payout at the discretion of management. Jason's Deli does not provide its individual deli stores with direction on how to make these additional payments, so the way additional payments are made varies across stores. Jason's Deli keeps track of deliveries and reimbursements at all stores. Jason's Deli also tracks delivery addresses, which can be computer mapped to determine distances. However, Jason's Deli does not record which deliveries were combined into the same delivery trips.

Plaintiff Mohamed Hisham Eltayeb ("Eltayeb") brought this suit under the Fair Labor Standards Act ("FLSA") to recover unpaid minimum wages from when he worked as a delivery driver at Jason's Deli. Two additional plaintiffs have since joined the suit. Eltayeb claims that

Jason's Deli uses a flawed method to determine vehicle reimbursement rates. As a result of this method, the drivers' unreimbursed expenses allegedly caused their wages to fall below the federal minimum wage during some or all workweeks.

On January 8, 2021, the Court entered a Memorandum Opinion and Order granting in part and denying in part Eltayeb's Motion for Notice to Potential Plaintiffs and for Conditional Certification (Dkt. #29). In this opinion, the Court found that Eltayeb had met his burden of showing the potential plaintiffs within the proposed collective were likely similarly situated and could thus receive notice of the suit. Days later, the Fifth Circuit's decision in *Swales v. KLLM Transportation Services, L.L.C.* altered the standard by which district courts determine whether potential plaintiffs may be notified of a collective action. 985 F.3d 430 (5th Cir. 2021). Following this change in the law, Jason's Deli's filed a Motion for Reconsideration of the Court's Order Granting Class Notice (Dkt. #30). The Court granted the Motion for Reconsideration on March 19, 2021 (Dkt. #35).

On June 17, 2021, Eltayeb filed his Renewed Motion for Notice to Potential Plaintiffs (Dkt. #46). On December 14, 2021, the Court denied Plaintiff's Renewed Motion for Notice to Potential Plaintiffs (Dkt. #58). In that Order, the Court recognized Eltayeb's claim is based on the following equation:

**(Wage Payments[1] + Delivery Fees[2] + Additional Payouts[3]) - Business Related Automobile Expenses[4]**

---

[1] Wage payments refer to the hourly wages delivery drivers received.
[2] Jason's Deli paid its drivers a standard dollar amount for each delivery completed.
[3] Jason's Deli made additional payouts to certain drivers, but these payouts were not uniform across all store locations.
[4] Business related automobile expenses refer to gasoline expended on delivery routes, maintenance costs, etc.

(Dkt. #58 at p. 8). The Court noted that "the discovery conducted to date shows that there is a wide variation among the drivers with respect to virtually all of the key inputs into the liability formula" (Dkt. #58 at p. 8). However, the Court "recognize[d] that any number of Jason's Deli drivers may have recovered a net profit of less than the $7.25 per hour that the FLSA requires, particularly those that earned hourly wages of $8.65 or less" (Dkt. #58 at p. 11). And further explained that "the primary purpose behind collective actions stems from 'the need for efficient resolution in one proceeding of common issues.'" (Dkt. #58 at p. 11) (citing *In re JP Morgan Chase & Comp.*, 916 F.3d 494, 502 (5th Cir. 2019)). The Court then opined that "[i]n this case, even if the parties 'must pose an inquiry to each of the [] Plaintiffs, the Court does not see how doing so in one collective trial is any less difficult than posing the same inquiry in separate trials'" (Dkt. #58 at p. 11) (citing *Segovia v. Fuelco Energy LLC*, No. SA-17-CV-1246, 2021 WL 2187956, at *9–11 (W.D. Tex. May 28, 2021)). Despite denying Eltayeb's renewed motion for notice, the Court allowed Eltayeb another opportunity to compose a class (Dkt. #58 at p. 12). Specifically, the Court authorized additional discovery to facilitate a determination of whether "Jason's Deli drivers who earned $8.65 per hour or less are similarly situated in a manner that would allow the Court to collectively answer the ultimate question of liability" (Dkt. #58 at p. 12). Any other route, the Court explained, "would either leave potential plaintiffs without a remedy for their underpaid wages or result in separate trials, thus defeating the efficiency that collective actions are intended to create" (Dkt. #58 at p. 12).

On January 12, 2022, the parties submitted a Joint Motion to Submit Briefing for Discovery Plan (Dkt. #61), indicating they could not come to a mutual agreement on the scope of the

additional discovery. On January 18, 2022, both parties submitted briefs on the issue (Dkt. #63; Dkt. #64). The Court ordered discovery as follows:

> 1. Jason's Deli will produce a store list identifying each of the 122 stores, as well as the number of delivery drivers employed at that location, who were paid $8.65 or less;
> 2. The Parties will randomly select five stores from each of the four regions (20 total stores), in addition to the five stores that were previously selected as Representative Stores per the Court's order.
> 3. For each selected deli location, the Parties will randomly select two delivery drivers who were paid a rate of $8.65 or less. If the deli has eight or more delivery drivers employed at that rate during the relevant time period, then the parties will randomly select three delivery drivers for that deli. If the location has two or fewer drivers employed at that rate, all of those drivers will be selected.
> 4. For each selected delivery driver, Jason's Deli will produce the following:
>     a. Employee Pay History reports;
>     b. Delivery Driver Payout forms;
>     c. Delivery Driver Details (date and address of each delivery made by the Delivery Driver); and
>     d. Any records in Jason's Deli's possession of the vehicle, make, and model used by the Delivery Driver.
> 5. Plaintiff may send interrogatories to and/or depose current store managers regarding store-specific inquiries; and
> 6. Jason's Deli may send questionnaires to the randomly selected delivery drivers and have the opportunity to take up to ten depositions of the randomly selected drivers.

(Dkt. #65 at p. 2). A new scheduling order was entered on June 9, 2022, which allowed the parties just over five months to complete discovery (Dkt. #68).

On December 22, 2022, Eltayeb filed the present second renewed motion seeking notice to potential plaintiffs in this collective action (Dkt. #70). On January 16, 2023, Jason's Deli filed a response (Dkt. #78). On January 19, 2023, Jason's Deli filed an amended response (Dkt. #82). On January 20, 2023, Eltayeb filed a reply (Dkt. #84). On January 27, 2023, Jason's Deli filed a sur-reply (Dkt. #87).

## LEGAL STANDARD

The FLSA requires covered employers to pay non-exempt employees a minimum wage, which is currently $7.25 an hour. 29 U.S.C. § 206(a). Section 216(b) imposes liability on employers for violations of § 206 and authorizes employees to bring an action for an employer's failure to pay the minimum wage. Employees may bring an FLSA minimum wage action individually or as a collective action on behalf of themselves and other "similarly situated" employees. 29 U.S.C. § 216(b). However, neither § 216(b) nor Fifth Circuit precedent defines "similarly situated"—thus leaving exactly who may be included in such an action an issue for the district court to decide. *See id.*

In contrast to a class action under Federal Rule of Civil Procedure 23, which generally requires potential plaintiffs to opt-out if they do not wish to be represented in the lawsuit, a collective action under § 216(b) requires potential plaintiffs to affirmatively opt into the lawsuit. *Swales*, 985 F.3d at 435. "Under § 216(b), district courts have the discretionary power to conditionally certify collective actions and authorize notice to potential class members." *Tice v. AOC Senior Home Health Corp.*, 826 F. Supp. 2d 990, 994 (E.D. Tex. 2011). Historically, courts in the Fifth Circuit have conditionally certified a collective by adhering to a two-step approach outlined in *Lusardi v. Xerox, Corp.*, 118 F.R.D. 351 (D.N.J. 1987). Under the first stage of *Lusardi*, the plaintiff "bears the burden of presenting preliminary facts showing that a similarly situated group of potential plaintiffs exists." *Tice*, 826 F. Supp. 2d at 995 (citing *Mims v. Carrier Corp.*, No. 2:06-cv-206, 2008 WL 906335, at *3 (E.D. Tex. March 31, 2008)). To carry this burden, "a plaintiff need only show that [its] position[] [is] similar to the potential plaintiffs, not identical." *Allen v. McWane, Inc.*, No. 2:06-cv-158 (TJW), 2006 WL 3246531, at *2 (E.D. Tex. Nov. 7, 2006).

The court is instructed to "satisfy itself that the potential plaintiffs are similarly situated with respect to their job requirements and pay provisions." *Id.*

The first step under *Lusardi* "usually occurs early in the case" and therefore the determination of conditional certification "is made using a fairly lenient standard requiring nothing more than substantial allegations that the putative class members were victims of a single decision, policy or plan." *Tice*, 826 F. Supp. 2d at 995 (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995)). Stage two of *Lusardi* takes place after discovery. If, after discovery, a defendant can show the plaintiffs are not, in fact, similarly situated, it has the opportunity to move to "decertify" the collective action. *Lusardi*, 118 F.R.D. 351.

In *Swales*, the Fifth Circuit rejected the traditional two-step *Lusardi* approach to collective action certification and created a more stringent process. 985 F.3d at 441. In contrast to the flexibility offered by *Lusardi*, the Fifth Circuit in *Swales* directs district courts to "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'" *Swales*, 985 F.3d at 441. After identifying the relevant material facts and legal considerations, the district court "should authorize preliminary discovery accordingly." *Id.*

In determining whether notice should be provided to those employees "similarly situated," the district court must ultimately decide whether "merits questions can be answered collectively." *Id.* at 442. This requires a court to consider "all of the available evidence to determine whether notice is going out to the putative class members," and the determination must be made as early

as possible in the span of litigation. *Id*. at 441–42. Given this fact-intensive approach, the conclusion will vary case-by-case. *Id*. at 441.

Notice to potential plaintiffs is proper if the available evidence establishes that the plaintiff has met the "similarly situated" threshold. *See id*. at 443. The plaintiff may meet this threshold at varying stages of discovery; for instance, "notice might be justified when the pleadings and only preliminary discovery show sufficient similarity between the plaintiffs' employment situations." *Id*. at 441. Other times, if an employee seeks to certify a class where "plaintiffs have demonstrably different work experiences," a district court might "need more discovery to determine whether notice is going out to those 'similarly situated.'" *Id*. at 442. In the latter situation, a district court may: (1) "conclude that the Plaintiffs and Opt-ins are too diverse a group" to support a collective action; (2) "decide that [the court] needs further discovery to make [a] determination"; or (3) "find that only certain subcategories of" employees "should receive notice." *Id*. at 443. In any case, to prevent the collective action from "quickly devolv[ing] into a cacophony of individual actions," *Swales* instructs the district court that potential plaintiffs are not similarly situated if answering a threshold merits questions requires a "highly individualized inquiry into each potential opt-in's circumstances." *Id*. at 442.

Under this newly articulated standard, "*Lusardi* and its requirements are dead and gone." *Collins v. Pel-State Bulk Plant, LLC*, No. MO20CV00083, 2021 WL 5234968, at *4 (W.D. Tex. Sept. 29, 2021). "The bottom line is that the district court has broad, litigation-management discretion" when determining whether to "certify" a collective action. *Id*.

# ANALYSIS

## I.     Eltayeb has not shown that the potential opt-in plaintiffs are similarly situated.

Pursuant to the Court's discovery order (Dkt. #65), "the parties randomly selected 48 delivery drivers paid $8.65 per hour or less for discovery" (Dkt. #70 at p. 10). Jason's Deli "produced enough work time, pay, delivery and reimbursement data to facilitate at least one weekly minimum wage compliance calculation for 43 of those 48 delivery drivers" (Dkt. #70 at p. 10).

Eltayeb employed Total Trial Solutions, LLC ("TTS") to compile the information for each of the delivery drivers within the sample into a spreadsheet (Dkt. #70 at p. 10). "Through that spreadsheet, TTS applied the [Internal Revenue Service ("IRS")] standard business mileage rate ("IRS rate") and an adjustment factor to DMI's weekly work time, pay, delivery and reimbursement data to calculate whether DMI complied with the minimum wage each workweek and, if not, the amount of the weekly minimum wage deficit" (Dkt. #70 at p. 10). TTS began with the mileage recorded for a delivery driver and used an adjustment factor to account for any discrepancies in mileage for combined deliveries (Dkt. #70, Exhibits 16, 17). TTS then multiplied that adjusted mileage by the IRS rate to approximate the vehicle expenses for that delivery driver (Dkt. #70, Exhibits 16, 17). TTS used the approximated vehicle expenses to determine whether the driver was paid less than minimum wage (Dkt. #70, Exhibits 16, 17). Based on these calculations, Eltayeb contends that the potential opt-in plaintiffs are similarly situated pursuant to *Swales* and notice should be provided to those employees (*See* Dkt. #70). However, at this juncture, the Court is not persuaded that the potential opt-in plaintiffs are similarly situated.

A.    **Eltayeb cannot rely on the IRS rate alone to show that the opt-in plaintiffs are similarly situated.**

To show that the potential opt-in plaintiffs suffered a minimum wage deficit and thus were similarly situated, Eltayeb relies on the IRS rate as representative evidence of the potential opt-in plaintiffs' business-related automobile expenses (Dkt. #70 at p. 10). In response, Jason's Deli argues "when an employee seeks to introduce statistical or representative evidence that relates to a group of employees, the Court must determine whether the circumstances show that the experiences of that group are sufficiently similar to the employee's experience" (Dkt. #82 at p. 8) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016)). Jason's Deli contends that the IRS rate is not valid representative evidence because there is no way to determine whether the IRS rate is comprised of automobile expenses sufficiently similar to that of the potential opt-in plaintiffs' automobile expenses (Dkt. #82 at p. 12). The Court agrees that Eltayeb cannot show that the potential opt-ins are similarly situated through the use of the IRS rate alone.

This is not to say that a plaintiff may never use a representative sample to show that potential opt-in plaintiffs are similarly situated. The Supreme Court in *Tyson Foods* makes clear that "[w]hether and when statistical evidence can be used to establish classwide liability will depend on the purpose for which the evidence is being introduced and on the elements of the underlying cause of action" 577 U.S. at 455. Indeed, "[i]n many cases, a representative sample is the only practicable means to collect and present relevant data establishing a defendant's liability." *Id.* A sample is a "permissible method of proving classwide liability [if the plaintiff shows] that each class member could have relied on that sample to establish liability if he or she had brought an individual action." *Id.* In *Tyson Foods*, a representative sample was held to be sufficient because

the "experiences of [the] subset of employees [comprising the representative sample] could be probative as to the experiences of all of them." *Id.* at 459.

At this time, Eltayeb has not shown that the IRS rate, as a representative sample of the potential opt-in plaintiffs' automobile expenses per mile, could be probative as to the experiences of all the opt-in plaintiffs. As Jason's Deli points out, the IRS rate is drawn from a national sample. *See Hatmaker v. PJ Ohio, LLC*, No. 3:17-CV-146, 2019 WL 5725043, at *5 (S.D. Ohio Nov. 5, 2019) ("The IRS bases these rates on cost data and analysis compiled every year by Runzheimer International, an independent research firm that contracts to the IRS. Runzheimer International uses data from across the country and measures auto insurance premiums, gas prices, maintenance costs, depreciation and other costs that go into operating a vehicle."). Eltayeb concedes as such when he states "[b]y comparison, the IRS rate is the 'national average cost of operating a motor vehicle'" (Dkt. #70 at p. 11) (citing *Zellagui v. MCD Pizza, Inc.*, 59 F. Supp. 3d 712, 716 (E.D. Pa. 2014)). Because the IRS does not disclose its methodology, the Court cannot be sure of the data used to calculate the IRS rate. Therefore, the Court cannot determine if the IRS rate is indeed representative of the potential opt-in plaintiffs pursuant to *Tyson Foods*.

Eltayeb contends that the IRS rate can be used to approximate the potential opt-in plaintiffs' vehicle expenses because it has been considered a reasonable reimbursement rate by some courts (Dkt. #70 at p. 13–14). However, an employer is not required to pay the IRS rate, and an employer may instead adopt a reasonable approximation of vehicle expenses. *See Barker v. ITL Foods, LP*, No. H22342, 2023 WL 5613409 (S.D. Tex. July 24, 2023), *report and recommendation adopted*, No. 4:22-CV-00342, 2023 WL 5615783 (S.D. Tex. Aug. 29, 2023) ("[T]he applicable regulations provide an employer with two choices: (1) track and reimburse actual expenses; or (2)

reimburse a reasonable approximation of the actual expenses. Using the IRS rate is one way of reasonably approximating the amount expended.") (citation omitted). Here, it is quite possible that a reasonable approximation of the potential opt-in plaintiffs' vehicle expenses is less than the IRS rate. Therefore, the potential opt-in plaintiffs should not rely on the IRS rate to show that they were paid under minimum wage without support that the IRS rate is indeed representative of their automobile expenses per mile.

Pursuant to the Court's Order on discovery, Jason's Deli produced information on a sample of delivery drivers who were paid $8.65 per hour or less. As Jason's Deli argues, evidence of the driving experiences of the individuals could have been determined from their deposition testimony, and Eltayeb had the opportunity to seek the additional information needed (Dkt #82 at p. 7). Accordingly, Eltayeb could have presented a companywide estimate of the delivery drivers' automobile expenses. Because Eltayeb instead relied on the IRS rate, Eltayeb has not made a threshold showing that the potential opt-in plaintiffs are similarly situated.

### B. Eltayeb cannot rely on the use of "adjustment factors" without explanation to show that opt-in plaintiffs are similarly situated.

Though Jason's Deli tracks delivery addresses and the mileage between that address and the particular store that the delivery is departing from, it does not track which deliveries were combined into the same trips or the combined mileage of those trips (Dkt. #70 at p. 10). To combat that issue, Eltayeb uses adjustment factors to account for the potential that a delivery driver made multiple deliveries in a single run (Dkt. #70 at p. 10). Specifically, Michael Earner ("Earner"), President of TTS states that he "applied an 'adjustment factor' to decrease total weekly work mileage" (Dkt. #70, Exhibit 9 at p. 3). And that he applied a "28.6% adjustment factor" and a "39.8% adjustment factor" (Dkt. #70, Exhibit 9 at p. 4). However, Earner provides no further

explanation as to why the particular adjustment factors of 28.6% and 39.8% were selected or how those adjustment factors are appropriate in this case (*See* Dkt. #70, Exhibit 9).

According to Eltayeb, Jason's Deli's expert witness in *Benton v. Deli Management, Inc.*, 396 F. Supp. 3d 1261 (N.D. Ga. 2019), Dr. Janet Thornton, said that "Defendants' failures to record delivery mileage and/or combined deliveries can be overcome by applying an 'adjustment factor'" (Dkt. #70 at p. 10, n.1). Eltayeb further explained that "Dr. Thornton identified and applied two different 'adjustment factors' in *Benton*, specifically a 28.6% reduction of mileage and a 39.8% reduction of mileage"[5] (Dkt. #70 at p. 10, n.1).

In *Benton*, the plaintiffs composed a conditionally certified class, under *Lusardi*, of Jason's Deli delivery drivers. 396 F. Supp. 3d at 1267. The plaintiffs alleged that Jason's Deli violated the FLSA because the plaintiffs "incurred unreimbursed vehicle-related expenses on Jason's Deli's behalf, the cost of which drove their wages below the FLSA-mandated minimum." *Id.* at 1268. Following discovery, Jason's Deli argued that the collective action could no longer be maintained. *Id.* To rebut the reliability of the plaintiffs' expert witness, Jason's Deli offered the testimony of Dr. Janet Thornton. *Id.* at 1284.

Dr. Thornton's expert report indicates that she was hired to review the findings of the plaintiffs' expert regarding his estimate for the average round-trip delivery mileage (Dkt. #70, Exhibit 18 at p. 4). Dr. Thornton found that the plaintiffs' expert "fail[ed] to account for the possibility that each delivery order was not necessarily a separate delivery 'run'" (Dkt. #70, Exhibit 18 at p. 4). Instead, she notes that "delivery orders were combined whenever possible so that drivers did not always return to the store between deliveries" (Dkt. #70, Exhibit 18 at p. 4–5).

---

[5] Eltayeb indicates that he "does not agree that Dr. Thornton's methods of calculating the 28.6% and 39.8% decreases, but [he] accept[s] those percentage decreases for the purpose of illustration in this Motion" (Dkt. #70 at p. 19).

She opined that "[t]aking this practice into account would thereby result in a lower mileage estimate" (Dkt. #70, Exhibit 19 at p. 4). Dr. Thornton relied on the delivery records provided by opt-in Susan Mello that showed her actual recorded delivery mileage and compared it with the plaintiffs' expert report to determine that the average mileage was inflated by 28.6% (Dkt. #70, Exhibit 18 at p. 6). She then compared plaintiffs' expert's determination to the usage of a mobile application being used by Jason's Deli at the time that collected the actual mileage of deliveries and determined the average mileage was inflated by 39.8% (Dkt. #70, Exhibit 18 at p. 7).

Jason's Deli argues that the adjustment factors used by Dr. Thornton in *Benton* were merely "spot samples showing that the failure to address the multiple-delivery problem had significantly inflated the numbers in [the competing expert's] report" (Dkt. #82 at p. 16). Indeed, Dr. Thornton seems only to conclude that "it is necessary to determine the correct mileage between destinations and to adjust the estimates for multiple deliveries to the same location and multiple deliveries within a run" (Dkt. #70, Exhibit 18 at p. 29). Regardless, Dr. Thornton's analysis was specific to a review of the *Benton* plaintiffs' expert report.

Here, Jason's Deli argues that Earner must show that the particular adjustment factors are statistically significant or appropriate in the current case (Dkt. #82 at p. 16). The Court is inclined to agree. Though Dr. Thornton used these adjustment factors in a previous case on behalf of Jason's Deli, Earner does not provide any level of analysis on why he selected the adjustment factors. Moreover, it is unclear why Eltayeb would rely on these adjustment factors to show that the opt-in plaintiffs are similarly situated when he volunteers that he does not agree with the methods used to calculate them (*See* Dkt. #70 at p. 24, n.9). Without an explanation from Earner

as to the appropriateness of the particular adjustment factors as applied to this case, the Court cannot determine whether the potential opt-in plaintiffs are similarly situated.

II.     **Eltayeb may use representative evidence to show that the potential opt-in plaintiffs are similarly situated.**

In *Swales*, the Fifth Circuit instructed that a district court must "consider all of the available evidence" to determine "whether and to whom notice should be issued." 985 F.3d at 442. "After considering all available evidence, [a] district court may conclude that the [p]laintiffs and [o]pt-ins are too diverse a group to be similarly situated . . . , or at least that [the] [p]laintiffs have not met their burden of establishing similarity." *Id.* at 443. Under those circumstances, the court "may decide that the case cannot proceed on a collective basis." *Id.* On the other hand, the court "may instead decide that it needs further discovery to make this determination." *Id.*

The Court's prior Order authorized additional discovery to facilitate a determination of whether Jason's Deli drivers who earned $8.65 per hour or less are similarly situated in a manner that would allow the Court to collectively answer the ultimate question of liability (Dkt. #58 at p. 12). Eltayeb has not made that showing, but the Court will give Eltayeb a final opportunity to do so.

If Eltayeb chooses to use representative evidence, that evidence must comport with *Tyson Foods*. Moreover, Eltayeb must give an explanation as to the appropriateness of any statistical analysis or adjustment of the relevant data to show that the potential opt-ins in this specific case are similarly situated.

### CONCLUSION

It is **ORDERED** that Plaintiff's Combined Second Renewed Motion for Notice to Potential Plaintiffs (Dkt. #70) is **DENIED** without prejudice.

**IT IS SO ORDERED.**

**SIGNED this 25th day of March, 2024.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE